UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In Re:

Chapter 11
Hallucination Media, LLC,                                    Case No.: 8:16-bk- 04116-RCT

      Debtor.
_____/

Hallucination Media, LLC,

      Plaintiff,

v.

The Ritz Ybor, LLC, N. C. J. Investment,                     Adv. Pro. No:  8:19-ap-00134-RCT
LLC,  Joe Capitano, Jr., Amphitheatre
Events, LLC, and John A. Santoro,

      Defendants.
_____/

**NOTICE OF APPEAL**

Plaintiff, Hallucination Media, LLC, pursuant to 28 U.S.C. § 158(a) and Federal Rule of

Bankruptcy Procedure 8002, gives notice of its appeal to the District Court for the Middle

District of Florida (i) the *Order Granting Motion For Summary Judgment filed by John Santoro*

*and Amphitheatre Events, LLC; Count IV of Plaintiff's complaint is dismissed as to John Santoro*

*and Amphitheatre Events, LLC* (Doc 82) entered on July 14, 2021, attached hereto as Exhibit

"A", (ii) the *Order Denying Motion for Rehearing (Denying Second Amend Motion for*

*Reconsideration)* (Doc 95) entered on September 27, 2021, attached hereto as Exhibit "B", (iii)

the *Memorandum Decision and Order Granting, In Part, and Denying, in Part, Defendants Ritz*

*Ybor, LLC, Joseph Capitano, Jr., and N.C.J. Investment Company's Amended Motion for*

1

*Summary Judgment* (Doc 97) entered on October 29, 2021, attached hereto as Exhibit "C", (iv) the *Order Denying Motion for Rehearing /Reconsideration of Order Granting Defendants' Summary Judgment in Part* (Doc 101) entered on December 8, 2021, attached hereto as Exhibit "D", and (v) the *Order Granting Motion For Summary Judgment on Counts I and II of Plaintiff's Complaint* (Doc 141) entered on February 22, 2022, attached hereto as Exhibit "E".

The nature of this appeal is the appeal of a final order.

The name, address, telephone number, and other contact information for the attorneys for the other parties to this appeal are as follows:

JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
Robert V. Potter (FBN: 0363006)
Email: bobp@jpfirm.com
Angelina E. Lim (FBN: 158313)
angelinal@jpfirm.com
401 E. Jackson Street #3100
Tampa, FL 33601-1100
Telephone: 813-225-2500
Facsimile: 813-223-7118
Counsel for The Ritz Ybor, LLC, N. C. J.
Investment, LLC, and Joe Capitano, Jr.

SIVYER BARLOW & WATSON, P.A.
Mahlon Barlow (FBN 0871117)
mbarlow@sbwlegal.com
Alicia R. Whiting-Bozich (FBN 088883)
awhitingbozich@sbwlegal.com
401 E. Jackson St., Suite 2225
Tampa, FL 33602
Telephone: (813) 221-4242
Facsimile: (813) 227-8598
Attorneys for Amphitheatre
Events, LLC and John Santoro

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of this *Notice of Appeal* has been served, on this 8th day of March, 2022, on all interested parties by either CM/ECF or U.S. Mail.

/s W. Bart Meacham
W. Bart Meacham, Esquire
Florida Bar No.  0043000
308 E. Plymouth St.
Tampa, FL 33603-5957
(813) 223-6334
(813) 425-6969
Email: wbartmeacham@yahoo.com
Attorney for Hallucination Media, LLC

# Exhibit "A"

ORDERED.

**Dated: July 14, 2021**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Hallucination Media, LLC,

          Debtor.

_____/

Hallucination Media, LLC,

          Plaintiff,

vs.

The Ritz Ybor, LLC, N.C.J. Investment Company,
Joseph Capitano, Jr., Amphitheatre Events, LLC,
and John A. Santoro,

          Defendants.

_____/

Case No. 8:16-bk-04116-RCT
Chapter 11

Adv. No. 8:19-ap-00134-RCT

**ORDER GRANTING AMENDED MOTION FOR SUMMARY
JUDGMENT AND DISMISSING COUNT IV OF THE COMPLAINT
AS TO DEFENDANTS JOHN SANTORO AND AMPHITHEATRE EVENTS, LLC**

THIS PROCEEDING is considered on John Santoro and Amphitheatre Events, LLC's

(collectively, "Amphitheatre Defendants") Amended Motion for Summary Judgment (Doc. 63)

(the "Motion"), Plaintiff Hallucination Media, LLC's response in opposition (Doc. 69), and

Amphitheatre Defendants' reply (Doc. 77).

Amphitheatre Defendants seek summary judgment on Count IV of Plaintiff's complaint (Doc. 2) which alleges tortious interference with a contract and business relationship. The Motion is supported by John Santoro's affidavit. Amphitheatre Defendants argue that any interference in the relationship was justified on grounds of competition privilege. Plaintiff disagrees but offers no countervailing evidence other than a conclusory declaration incorporated in its response.

The Court has considered the summary judgment record, together with the relevant case law, and for the reasons stated below, concludes that the Motion should be granted.

## Background[1]

Plaintiff sues The Ritz Ybor, LLC ("The Ritz"), N.C.J. Investment Company ("NCJ") (collectively "The Ritz Entities"), Joseph Capitano, Jr., Amphitheatre Events, LLC ("Amphitheatre Events"), and John Santoro ("Santoro").[2] The claims are based on an unraveling business relationship between Plaintiff and The Ritz Entities. The nature and extent of that relationship is heavily disputed and is the central issue in the litigation.

The Ritz operated a special events venue located at 1503 East 7th Avenue, Tampa, Florida 33605 (the "Venue") owned by NCJ.[3] Joseph Capitano, Jr. was the managing member of The Ritz and a shareholder in NCJ. Joseph Capitano, Sr. apparently controlled NJC during the events in question.[4]

Plaintiff and its managing members Bryan Nichols and Steven McClure promoted and produced "club nights" at the Venue on most Friday nights from August 2013 to May 6, 2016,

---

[1] For the purposes of providing context, the Court cites to the unproven allegations in the complaint and the affidavit of Joseph Capitano, Jr., which is submitted in support of the other defendants' motion for summary judgment (Doc. 61).
[2] Doc. 2.
[3] Doc. 62 (Affidavit of Joseph Capitano, Jr.) ¶ 5.
[4] Doc. 62 ¶ 6.

some Saturday nights, and various other nights from time to time.[5]  The club nights were generally dance events with a DJ, and they generated door and bar revenue.  In January of 2016, the relationship soured, and the parties began to discuss ending their relationship.[6]

The Ritz Entities assert that any relationship Plaintiff had was with The Ritz only, and at most, Plaintiff was granted a license to use the Venue during limited hours and days on a week to week basis.[7]  Plaintiff contends the relationship was a partnership and further that it held a three-year lease to use the Venue on certain nights with a right of first refusal on future agreements for those nights.[8]

Only Count IV of the complaint—tortious interference with a contract and business relationship—is directed against Amphitheatre Defendants.[9]  There, Plaintiff alleges that Santoro and Amphitheatre Events, a "rival club," intentionally and unjustifiably interfered with its relationship with The Ritz Entities by negotiating a long-term lease of the Venue following a fire at Amphitheatre Events' previous location.[10]  The complaint asserts this lease displaced Plaintiff from the Venue and Plaintiff suffered damages as a result.[11]

### Undisputed Facts

Santoro is a promoter, club owner, founder, and authorized agent for Amphitheatre Events and various other entities.[12]  On April 6, 2016, a fire destroyed Santoro's club venue, known as the "Amphitheatre."  The Amphitheatre venue hosted events and parties that Santoro's

---

[5]  Doc. 62 ¶ 18; Doc. 2 ¶ 16.
[6]  Doc. 2 Ex. H at 4–8.
[7]  Doc. 13 ¶ 17.
[8]  *See* Doc. 2 ¶ 17.
[9]  Doc. 2 ¶ 48.  Santoro is named as a defendant as an agent for Amphitheatre Events, who Plaintiff asserts is vicariously liable for Santoro's actions.  Doc. 2 ¶ 14.
[10]  Doc. 2 ¶¶ 30 & 31.
[11]  Doc. 2 ¶ 53.
[12]  Doc. 63 (Declaration of John Santoro) ¶ 1.  Santoro also is a founder and agent for The Amphitheatre, Inc., Amphitheatre Ybor, Inc., and Silver Bullet Events, LLC.

entities booked and promoted, including dance parties.[13]

Amphitheatre Events had future events booked at the Amphitheatre, so in the days after the fire Santoro began looking for a suitable replacement venue.  He noted they looked at several different venues.[14]  Santoro had conversations with Joseph Capitano, Sr., and others to relocate some or all their future events to the Venue.[15]

Santoro maintains that when his entities -- Silver Bullets, LLC and Amphitheatre Ybor Inc. -- were negotiating with The Ritz and NCJ for use of the Venue, he understood that Plaintiff did not have a lease or other contract, and was operating on a week to week basis.[16]  He also understood that in January 2016, The Ritz had begun the process of terminating its relationship and the weekly shows with Plaintiff.[17]

Ultimately, Santoro's entity Silver Bullets, LLC executed an initial "Promoter Space Rental Agreement," dated  April 28, 2016 with The Ritz to hold events at the Venue for about thirteen dates in May 2016.[18]  Thereafter, another Santoro entity, Amphitheatre Ybor, Inc., entered into a three-year lease agreement with NCJ to hold events at the Venue.[19]

Santoro explained his thought process in entering into these agreements as follows: his businesses needed a venue to operate and continue their events, and they had staff depending on their continued operation for their livelihoods.[20]

---

[13]  Doc. 63 ¶ 2.
[14]  Doc. 63 ¶ 6.  Santoro noted they moved their April 15 event to the Cuban Club.
[15]  Doc. 63 ¶ 8.
[16]  *Id.*
[17]  *Id.*
[18]  Doc. 63 ¶ 9.  The agreement, attached as an exhibit to Doc. 63, is dated April 28, 2016, and was executed by a representative of Silver Bullets, LLC on May 5, 2016.
[19]  Doc. 63 ¶ 10.
[20]  Doc. 63 ¶ 6.

## Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[21]   The existence of a factual dispute will not defeat a properly supported motion for summary judgment.[22]   "Only the existence of a genuine issue of material fact will preclude summary judgment."[23]   The initial burden of showing that there are no genuine issues of material fact is borne by the moving party.[24]   "When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact."[25]   In so doing, the non-moving party may not rely on the "mere allegations or denials of [its] pleadings."[26]   Instead, the non-moving party must offer facts supported by evidence which can be reduced to an admissible form.[27]

## Analysis

Amphitheatre Defendants assert they are entitled to summary judgment because their actions are protected by the competition privilege.   Under Florida law, competition and/or "activities taken to safeguard or promote one's own financial[] and contractual interests," provide a qualified privilege for interfering in business relationships.[28]

To succeed on its tortious interference claim, Plaintiff must prove (1) the existence of a contract or business relationship; (2) knowledge of the contract or relationship by the defendant;

---

[21]  Fed. R. Civ. P. 56(a) made applicable here by Fed. R. Bankr. P. 7056.
[22]  *Koehler v. Waypoint Res. Grp, LLC*, No. 8:18-cv-2017-T-60AAS, 2019 WL 5722117, at *1 (M.D. Fla. Nov. 5, 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).
[23]  *Id*.
[24]  *Id*. (citing *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004)).
[25]  *Id*. (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995)).
[26]  *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990).
[27]  *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).
[28]  *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980); *see also Johnson Enters. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir.1998) ("Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged.").

(3) an intentional and unjustified interference with the contract or relationship by the defendant; and (4) damage to the plaintiff as a result.[29]  The competition privilege, if shown, can negate as a matter of law the "unjustified interference" element of a tortious interference claim.[30]  Or it can be asserted as an affirmative defense.

To establish the competition privilege, Amphitheatre Defendants must prove (1) the business relationship at issue concerned a matter involved in the competition between the plaintiff and the defendant; (2) the defendant did not employ improper means; (3) the defendant did not intend to create or continue an illegal restraint of competition; and (4) the defendant's purpose was at least in part to advance its interest in competing with the plaintiff.[31]  The Court finds Amphitheatre Defendants have satisfied this burden.  Santoro's affidavit establishes each of the elements of the competition privilege.

To begin, Amphitheatre Defendants and Plaintiff were in a similar business and were competing for use of the Venue.  Plaintiff even refers to Amphitheatre Events as a "rival" in its pleadings.  It is also not seriously disputed that Amphitheatre Defendants acted properly. Indeed, the summary judgment record establishes that (i) Amphitheatre Defendants' building burned down; (ii) they needed a venue for events to continue operating; (iii) Santoro understood that the business relationship between Plaintiff and The Ritz was strained and that Plaintiff had no formal contract but instead operated in the Venue on a week to week basis; and (iv) after negotiation, certain of Santoro's entities, none of which, incidentally, are named as defendants, reached an agreement to use the Venue.  There is simply no evidence in the record that Amphitheatre Defendants used pretext, deceit, broken promises, fraudulent misrepresentation, or

---

[29] *Ethan Allen, Inc. v. Georgetown Manor, Inc*., 647 So. 2d 812, 814 (Fla. 1994); *see also Smith v. Ocean State Bank*, 335 So. 2d 641 (Fla. 1st DCA 1976).
[30] *See Ethyl Corp*, 386 So. 2d at 1224–25.
[31] *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc*., 262 F.3d 1152, 1159 (11th Cir. 2001).

other conduct that might support a finding of "improper means."[32]  Nor is there any evidence or suggestion of an illegal restraint of competition.  Amphitheatre Defendants simply had to find a new location after a fire destroyed their old location.  Amphitheatre Defendants sought out the Venue to advance their own economic interests—to protect events already scheduled and to keep their staff employed.

Amphitheatre Defendants having satisfied their initial burden on the Motion, the burden shifts to Plaintiff to demonstrate "specific facts showing the existence of genuine issues of material fact."[33]  Here, Plaintiff failed to offer any affidavits, answers to interrogatories or requests for admission, or any documentary evidence.  Instead, Plaintiff relies solely on the declaration of Nichols who generally attests to the contents of Plaintiff's response to the Motion.  Unfortunately, the response simply realleges the allegations in the complaint, which are largely conclusory.[34]

As it happens, Plaintiff does not seriously challenge Amphitheatre Defendants' assertion of competition privilege defense on the merits.  The only substantive argument made is that Amphitheatre Defendants' mere act of interference in the relationship is what makes their actions improper.  Of course, if that were the case, the competition privilege would serve no meaningful purpose.

---

[32] *Int'l Sales & Serv., Inc.*, 262 F.3d at 1160 (noting case law outside Florida in which courts found improper means where defendants used pretext, deceit, and/or broken promises); *Ice Portal, Inc. v. VFM Leonardo, Inc.*, No. 09-60230-CIV, 2010 WL 2351463, at *7 (S.D. Fla. June 11, 2010) ("Improper means include physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct, and threats of illegal conduct." (citations omitted)); *see also Restatement (Second) of Torts* § 767 cmt. c (1977) ("Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper.").
[33]  *Depositors Ins. Co. v. Loan Ranger Acquisitions, LLC*, 457 F. Supp. 3d 1255, 1258 (M.D. Fla. 2020) (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995)).
[34]  *Gordon v. Terry*, 684 F.2d 736, 743 (11th Cir.) ("In order to establish a genuine factual dispute, affidavits must set forth facts which are relevant to a viable legal theory."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("When a properly supported summary judgment motion has been made Fed. R. Civ. P. 56(e) provides that 'an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.'").

Rather, Plaintiff's primary argument is procedural. The response states that the Motion must be denied because "they did not raise such a privilege or purported privilege in the[ir] Answer."[35] This is simply not true. Amphitheatre Defendants raised the privilege in their answer, specifically listing as their first, and only, affirmative defense that they were entitled to "protect their business interest and such actions are privileged and immune from liability for tortious interference."[36] While Amphitheatre Defendants did not call the "competition privilege" by its name, they were not required to do so.[37]

In sum, the Court finds that Amphitheatre Defendants properly raised and supported their competition privilege defense and are, therefore, entitled to summary judgment on Count IV of Plaintiff's complaint. For these reasons, it is

**ORDERED**:

1. John Santoro and Amphitheatre Events, LLC's Amended Motion for Summary Judgment (Doc. 63) is GRANTED.

2. Count IV of Plaintiff's complaint is dismissed as to John Santoro and Amphitheatre Events, LLC.

Service of this Order other than by CM/ECF is not required. Local Rule 9013-3(b).

---

[35] Doc. 69 ¶ 14.
[36] Doc. 29 at 4.
[37] *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988).

# Exhibit "B"

ORDERED.

**Dated:  September 27, 2021**

_____

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Hallucination Media, LLC,

    Debtor.

_____/

Hallucination Media, LLC,

    Plaintiff,

vs.

The Ritz Ybor, LLC, N.C.J. Investment Company,
Joseph Capitano, Jr., Amphitheatre Events, LLC,
and John A. Santoro,

    Defendants.

_____/

Case No. 8:16-bk-04116-RCT
Chapter 11

Adv. No. 8:19-ap-00134-RCT

**ORDER DENYING PLAINTIFF'S**
**SECOND AMENDED MOTION FOR RECONSIDERATION**

   THIS PROCEEDING is considered on Plaintiff Hallucination Media, LLC's _Second_

_Amended Motion to Alter or Amend the "Order Granting Amended Motion for Summary Judgment_

_and Dismissing Count IV of the Complaint as to Defendants John Santoro and Amphitheatre_

_Events, LLC" Entered on July 14, 2021 (D.E. 82), in Accordance with Rule 59 of the Federal Rules_

of Civil Procedure and Rule 9023 of the Federal Rules of Bankruptcy Procedure (Doc. 94) (the

"Motion").   Defendants John Santoro and Amphitheatre Events, LLC (the "Amphitheatre

Defendants") did not respond.

Plaintiff seeks reconsideration of the Court's order granting the Amphitheatre Defendants

summary judgment on Count IV of the complaint (Doc. 82) (the "Order"), which alleged tortious

interference with a contract or business relationship.   The Court granted the Amphitheatre

Defendants summary judgment because it determined they established their actions were protected

by the competition privilege.

Motions for reconsideration are governed by Federal Rule of Bankruptcy Procedure 9023,

which incorporates Rule 59 of the Federal Rule of Civil Procedure ("Rule(s)").   Relief under Rule

59(e) is limited to the following circumstances: "(1) an intervening change in controlling law; (2)

newly discovered evidence; or (3) clear error or manifest injustice."[1]   Rule 59 is not a vehicle to

"relitigate old matters, raise argument or present evidence that could have been raised prior to the

entry of judgment."[2]   And, "reconsideration of a previous order is an extraordinary remedy to be

employed sparingly."[3]

Plaintiff does not point to any change in controlling law or any newly discovered evidence.

Instead, Plaintiff appears to seek reconsideration of the Order based on clear error of fact or law.

First, Plaintiff argues the Court improperly relied on the affidavit of Joseph Capitano, Jr.[4]

in granting the Amphitheatre Defendants summary judgment even though the Amphitheatre

Defendants did not offer this affidavit in support of their motion.   This argument fails because it

---

[1]  *Woide v. Fed. Nat'l Mortg. Ass'n (In re Woide)*, No. 6:16–cv–1484–Orl–37, 2017 WL 549160, at *1 (M.D. Fla. Feb. 9, 2017), *aff'd*, 730 F. App'x 731 (11th Cir. 2018).
[2]  *Id*. (quoting *Michael Linet, Inc. v. Vill. of Wellington, Fla*., 408 F.3d 757, 763 (11th Cir. 2005)).
[3]  *Burger King Corp. v. Ashland Equities, Inc*., 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002).
[4]  This affidavit was submitted in support of the other defendants' (Ritz Ybor, LLC, N.C.J. Investment Company, and Joseph Capitano, Jr.) motion for summary judgment and is plainly part of the record in this adversary proceeding.

is not true.  The Court did not rely on Joseph Capitano, Jr.'s affidavit in concluding that the Amphitheatre Defendants are insulated from liability due to their status as Plaintiff's competitor. As explained in the Order, the Court cited to the "the unproven allegations in the complaint and the affidavit of Joseph Capitano, Jr." in the background section merely "for the purpose[] of providing context."[5]  The Court even added a footnote to clarify the affidavit was not considered as part of the summary judgment record on the Amphitheatre Defendants' motion.[6]

Second, Plaintiff contends that "it appears" the Court granted the Amphitheatre Defendants' motion because Plaintiff did not demonstrate an "intentional and unjustified interference with the contract or relationship."  Plaintiff notes that the Amphitheatre Defendants sought "summary judgment on a [] competition privilege, and nothing more than a [] competition privilege" and accordingly the Court erred by purportedly granting summary judgment on this basis.  Again, Plaintiff misreads the Order.  Summary judgment was granted because the Amphitheatre Defendants established all of the requirements for the competition privilege.[7]  And, in turn, Plaintiff failed to establish any specific facts showing the existence of genuine issues of material fact.[8]

Accordingly, it is **ORDERED** that the Motion (Doc. 94) is **DENIED**.


Service of this Order other than by CM/ECF is not required.  Local Rule 9013-3(b).

---

[5] Doc. 82 at n.1.

[6] *Id.*

[7] These elements are: (1) the business relationship at issue concerned a matter involved in the competition between the plaintiff and the defendant; (2) the defendant did not employ improper means; (3) the defendant did not intend to create or continue an illegal restraint of competition; and (4) the defendant's purpose was at least in part to advance its interest in competing with the plaintiff. *Int'l Sales & Serv., Inc. v. Austral Insulated Prod., Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001).

[8] Doc. 82 at 7.

# Exhibit "C"

ORDERED.

**Dated: October 29, 2021**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Hallucination Media, LLC,

        Debtor.

Case No. 8:16-bk-04116-RCT
Chapter 11

_____/

Hallucination Media, LLC,

        Plaintiff,

vs.

The Ritz Ybor, LLC, N.C.J. Investment Company,
Joe Capitano, Jr., Amphitheatre Events, LLC,
and John A. Santoro,

        Defendants.

Adv. No. 8:19-ap-00134-RCT

_____/

**MEMORANDUM DECISION AND ORDER
GRANTING, IN PART, AND DENYING, IN PART,
DEFENDANTS RITZ YBOR, LLC, JOSEPH CAPITANO, JR., AND N.C.J.
INVESTMENT COMPANY'S AMENDED MOTION FOR SUMMARY JUDGMENT**

THIS PROCEEDING is considered following oral argument on Defendants Ritz Ybor,

LLC, Joseph Capitano, Jr., and N.C.J. Investment Company's (collectively, the "Ritz

Defendants") Amended Motion for Summary Judgment (Doc. 61) (the "Motion"), the affidavit

of Joseph Capitano, Jr. ("Mr. Capitano") in support of the Motion (Doc. 62), Plaintiff

Hallucination Media, LLC's response in opposition (Doc. 73) (the "Response"), and the Ritz Defendants' reply (Doc. 78).

The Ritz Defendants seek summary judgment on all counts of Plaintiff's complaint,[1] primarily based upon, but not limited to, the operation of the statute of frauds.  As to Count I, the Ritz Defendants assert that there is no written agreement to share control, profits, and losses necessary to establish a partnership nor, additionally, to legally bind the other party necessary to establish a joint venture.  Similarly, as to Count II, the Ritz Defendants assert that there is no written agreement providing Plaintiff with a right of first refusal.  As to Count III, the Ritz Defendants contend not only that there is no written lease agreement but also that the agreement alleged does not provide for the exclusive right to possess the real property necessary to establish a "lease" that would be subject to the provisions of Chapter 83 of the Florida Statutes.  Regarding Count IV, the Ritz Defendants assert that Mr. Capitano cannot be liable for tortious interference as he was, at all relevant times, not considered a separate entity to the alleged contracts as he was acting as an agent for Ritz Ybor and not in his individual capacity.  Further, the Ritz Defendants claim that they were within their rights to terminate the relationship with Plaintiff and that even if that were not the case, their actions would amount to a breach of contract which cannot be converted into a tort.  Finally, as to Count V, the Ritz Defendants argue that the claim fails because the statute of frauds may not be circumvented by an action for fraud.

Citing the emails exchanged and documents attached to those emails, Plaintiff disagrees with the Ritz Defendants' argument that writings sufficient to satisfy the statute of frauds do not exist.  But as an initial matter, Plaintiff argues that the Motion must be denied because the Ritz Defendants did not raise the statute of frauds as an affirmative defense in their answer.  The

---

[1]  Doc. 2 ("Compl.").  The Complaint is not verified and, thus, is not considered as part of the evidentiary record on summary judgment.  References to the Complaint are included for illustrative purposes only.

Response answers the Motion's remaining arguments, if at all, largely with conclusory denials.[2]

In support of the Motion, the Ritz Defendants proffered Mr. Capitano's affidavit. Plaintiff offers no evidence counter to Mr. Capitano's affidavit, other than a declaration of one of its principals averring to the statements made in the Response. The Response, however, is a hodge-podge of factual assertions, unsupported denials, arguments that are largely conclusory, and Plaintiff's conclusions of law. The Court considers only the properly supported factual assertions in the Response in rebuttal to Mr. Capitano's affidavit.[3]

The Court has considered the summary judgment record, together with the relevant case law, and the arguments of counsel made at oral argument on the Motion. For the reasons stated below, the Court concludes that the Motion should be granted, in part.

### Undisputed Facts

Before its own Chapter 7 bankruptcy,[4] Defendant Ritz Ybor, LLC ("The Ritz") operated a special events venue located at 1503 East 7th Avenue, Tampa, Florida 33605 (the "Venue"). The Venue is owned by Defendant N.C.J. Investment Company ("NCJ"). Mr. Capitano was the managing member of The Ritz. Although a shareholder in NCJ, Mr. Capitano did not control, legally or otherwise, NCJ nor did he, at any relevant time, act on behalf of NCJ.[5]

Plaintiff and its managing members, Bryan Nichols and Steven McClure,[6] promoted and produced "club nights" at the Venue, *i.e.*, dance events with a disk jockey, on most Friday nights

---

[2] At oral argument, counsel for Plaintiff took issue with whether the Motion went beyond the argument that the statute of frauds barred Plaintiff's claims due to the lack of a writing.

[3] *See Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.*, 793 F. App'x 896, 902 (11th Cir. 2019) ("[C]ourts may disregard statements that are not based on personal knowledge or are inadequately supported." (citing *Pace v. Capobianco*, 283 F.3d 1275, 1278–80 (11th Cir. 2002)); *see generally* Fed. R. Civ. P. 56(c)(4) (incorporated by Fed. R. Bankr. P. 7056).

[4] *In re The Ritz Ybor, LLC*, Case No. 8:17-bk-07387-CPM (Bankr. M.D. Fla. filed Aug. 22, 2017). The Ritz's chapter 7 case was closed March 8, 2021. Plaintiff filed a secured claim in that case based upon the claims asserted in this proceeding. It received no distribution on its claim from the bankruptcy estate.

[5] Doc. 62 (Aff. of Joseph Capitano, Jr. ("Capitano Aff.")) ¶¶ 3, 5, 6, & 7.

[6] Capitano Aff. ¶ 9; Response ¶ 5.

from August 2013 to May 6, 2016, some Saturday nights, and various other nights from time to time (the "Promoted Events").[7]  The Promoted Events generated door and bar revenues, which the parties agreed to share.[8]  According to the Ritz Defendants, Plaintiff shared in these revenues in the same manner as other promoters as part of The Ritz's "customary course of business operations."[9]  Mr. Capitano, in his individual capacity, did not share in the revenues generated.[10]  Whether the revenue sharing agreement among the parties extended into a larger sharing of profits and losses is disputed.

Expenses for the Promoted Events were also shared.[11]  With limited exceptions, the Ritz Defendants provided and paid for personnel and supplies associated with the Promoted Events.[12]  Certain improvements were made to the Venue at the suggestion of Plaintiff, which were paid for by the Ritz Defendants.[13]  According to Plaintiff, regardless of "who wrote the check," it was agreed that the costs of the improvements were obligations of the partnership.[14]  Similar to the dispute involving the revenue sharing agreement, whether the sharing of expenses among the parties was part of a larger sharing of profits and losses is disputed.

The nature and extent of the business relationship among the parties, if any, is documented in a series of email exchanges that occurred in June 2013, September 2014, and December 2015 through January 2016.[15]  In the latter most exchange, it is clear that the relationship had soured as they began to discuss a possible end to the relationship.[16]

The relationship among the parties apparently came to an end in April 2016, with

---

[7]  Capitano Aff. ¶¶ 9, 10, & 18; *see also* Compl. ¶ 16.
[8]  Capitano Aff. ¶¶ 10, 11, & 14.
[9]  Capitano Aff. ¶ 14.
[10]  Capitano Aff. ¶ 12.
[11]  Capitano Aff. ¶ 14.
[12]  *Id.*; Response ¶ 20.
[13]  Capitano Aff. ¶¶ 15–16; Response ¶ 20.
[14]  Response ¶ 20.
[15]  Capitano Aff. ¶¶ 10, 21, & 22; Capitano Aff. Exs. B, C, & D.
[16]  Capitano Aff. ¶ 23 & Ex. D.

Plaintiff's final promoted event at the Venue occurring on May 6, 2016.[17]  Plaintiff's bankruptcy was filed less than a week later.

The Venue was marketed and used for events other than the "club nights" promoted by Plaintiff.  Plaintiff did not have exclusive rights to host or promote events at the Venue.[18]

Plaintiff sues the Ritz Defendants based upon the unraveling of the business relationship.  The nature and extent of that business relationship is the central issue in this litigation.

### Positions of the Parties

Though they concede there was some form of a business relationship in existence, the Ritz Defendants assert that any relationship Plaintiff had was solely with The Ritz and, at most, Plaintiff was granted a license to use the Venue during limited hours and days on a week-to-week basis.  Plaintiff contends the relationship was a partnership or joint venture and further that it held a three-year lease to the Venue on certain nights with a right of first refusal on future agreements for those nights.

### Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19]  The mere existence of a factual dispute will not defeat a properly supported motion for summary judgment.[20]  "Only the existence of a genuine issue of material fact will preclude summary judgment."[21]  The initial burden of showing that there are no genuine issues of material fact is

---

[17]  Compl. ¶¶ 30–34.  Plaintiff alleges that a "rival club" interfered with its relationship with the Ritz Defendants by negotiating a long-term lease of the Venue following a fire at the rival's previous location.  The rival, Amphitheatre Events, and its principal, Mr. John Santoro, have been dismissed as defendants from this adversary.  Doc. 82.

[18]  Capitano Aff. ¶¶ 4, 10, & 13; *see also* Compl. ¶ 16 (noting "third party events").

[19]  Fed. R. Civ. P. 56(a) made applicable here by Fed. R. Bankr. P. 7056.

[20]  *Koehler v. Waypoint Res. Grp, LLC*, No. 8:18-cv-2017-T-60AAS, 2019 WL 5722117, at *1 (M.D. Fla. Nov. 5, 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

[21]  *Id.*

borne by the moving party.[22]

If the moving party satisfies its initial burden, the burden shifts and "the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact."[23]  In so doing, the nonmoving party may not rely on the "mere allegations or denials of [its] pleadings."[24]  Instead, the nonmoving party must offer facts supported by evidence which can be reduced to an admissible form.[25]  Nonetheless, "[i]f there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor."[26]

### Discussion

To begin, the summary judgment record leaves something to be desired.  The parties fundamentally disagree as to the import of the email discussions that, indisputably, form the factual predicate for Plaintiff's claims.  But with the benefit of oral argument, the Court concludes that summary judgment is appropriate, at least in part.

*Pleading the Statute of Frauds*

The Ritz Defendants contend Plaintiff's claims cannot stand as they are based upon agreements not reduced to writing and therefore do not comply with the statute of frauds. Plaintiff strongly disagrees but, as an initial matter, responds that the Ritz Defendants have waived any such claim by failing to plead the statute of frauds as an affirmative defense.

While the Court agrees with Plaintiff that the Ritz Defendants did not plead the statute of frauds in their answer,[27] it does not agree that the Ritz Defendants are therefore barred from

---

[22] *Id.* (citing *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004)).

[23] *Id.* (citing *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995)).

[24] *Walker v. Darby*, 911 F.2d 1573, 1576 (11th Cir. 1990).

[25] *Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005).

[26] *Koehler v. Waypoint Res. Grp, LLC*, No. 8:18-cv-2017-T-60AAS, 2019 WL 5722117, at *1 (M.D. Fla. Nov. 5, 2019) (citing *Shotz v. City of Plantation, Fla*. 344 F.3d 1161, 1164 (11th Cir. 2003)).

[27] Doc. 13.

asserting the defense now.  As the Ritz Defendants correctly note, courts have held that a failure to plead an affirmative defense as required by Rule 8(c) of the Federal Rules of Civil Procedure ("Rule(s)")[28] is not necessarily fatal and that the unpled affirmative defense may nevertheless be asserted and further proven at trial provided the plaintiff is on notice of the defense.

> When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue.[29]

Plainly, Plaintiff is now on notice of the Ritz Defendants' assertion of the statute of frauds defense.  Reviewing the record, the Court finds it difficult to conclude that the defense comes as a complete surprise to Plaintiff.  The Ritz Defendants' answer strongly suggests the defense as they acknowledge the emails exchanged but assert that no formal agreements were ever finalized and claim instead that "at best" Plaintiff had a license to use the Venue.  For that matter, correspondence from Plaintiff's counsel attached to the Complaint demonstrates that the enforceability of any alleged agreement was at issue due to the statute of frauds.[30]

But the fact that the Ritz Defendants may now raise their statute of frauds defense does not mean that they are necessarily entitled to summary judgment, at least not at this time.  At oral argument, Plaintiff's counsel suggested that he did not conduct detailed discovery on the issue given the Ritz Defendants' failure to plead.  Accordingly, and notwithstanding that the Ritz Defendants have not sought leave to amend their answer, the Court will deem the Ritz Defendants' answer amended to assert the statute of frauds defense and further will also allow limited discovery on the issue as it relates to Plaintiff's breach of partnership and breach of the

---

[28] Fed. R. Civ. 8 is incorporated herein by Fed. R. Bankr. P. 7008.
[29] *Bergquist v. Fidelity Info. Servs., Inc.*, 197 F. App'x 813, 815 (11th Cir. 2006) (quoting *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988)); *see, e.g.*, *Grant v. Preferred Rsch., Inc.*, 885 F.2d 795, 797–98 (11th Cir. 1989) (approving of a district court's consideration at trial of a statute of limitation defense asserted initially in a motion for summary judgment filed a month before trial).
[30] Compl. Ex. K.

right of refusal claims. New discovery deadlines will be set by a forthcoming scheduling order.

*Counts I & II – Breach of the Partnership & Breach of Right of First Refusal*

Assuming without deciding that the Ritz Defendants have met their initial burden on summary judgment, the Court finds that Plaintiff has demonstrated the existence of triable issues of material fact. It is undisputed that the parties had some degree of business relationship involving the Promoted Events and for that matter that the revenues and expenses for those events were shared. Whether that sharing rises to the level of a partnership or joint venture remains to be seen. The summary judgment record as it stands is a pair of dueling affidavits from individuals who participated in the parties' negotiations and simply does not clearly define the business relationship. Without such clarity, it is difficult to determine whether the statute of frauds would bar Plaintiff's claims.

For this reason, summary judgment on Counts I and II is due to be denied. However, as indicated above, the Court will reopen discovery limited to the issue of the statute of frauds as it relates to Plaintiff's breach of partnership and breach of the right of refusal claims.

*Count III – Statutory Action under Florida Statutes § 83.05*

The Ritz Defendants make two arguments as to Count III. First, there is no written lease agreement among the parties as to the Venue that would satisfy the statute of frauds. Second, the agreement alleged does not provide for the exclusive right to possess the property necessary to establish a "lease" that would be subject to the provisions of Chapter 83 of the Florida Statutes. Plaintiff addressed only the first argument in the Response but both at oral argument.

It is not disputed that there is no formal written lease for the Venue between Plaintiff and either The Ritz or NCJ. Rather, Plaintiff asserts that the email correspondence reflects its right to possession of the Venue "as a tenant." At oral argument, Plaintiff also highlighted the fact that it

had procured insurance consistent with a tenancy and that Plaintiff had keys to the premises and "24/7 access."[31] The Ritz Defendants effectively concede that whatever the business relationship among the parties may have been, it arose from the email correspondence. But they argue that Plaintiff had, if anything, merely a license to use the Venue for the Promoted Events.

Viewing the record more favorably to Plaintiff as it must, the Court might very well conclude on the issue of the statute of frauds that Plaintiff had raised a triable issue of fact. But the Court need not make that determination as it finds the second issue dispositive. The agreement alleged here is not properly characterized as a lease.[32]

Because Plaintiff seeks damages for an alleged violation of Florida Statute § 83.05,[33] the Court looks to Florida law to decide the matter. Florida law provides that the "proper characterization" of an agreement involving rights to real property "is discerned by the actual terms, conditions, rights and obligations expressly set forth in the agreement."[34] Here, the Court must determine if the parties' "agreement" is fairly characterized as a lease or, as the Ritz Defendants suggest, a license.[35]

A tenant under a lease is one who has been given a possession of land which is exclusive even of the landlord except as the lease permits his entry, and saving

---

[31] Yet, counsel for Plaintiff also agreed that evidence of these matters, which were raised at oral argument, were not properly made part of the summary judgment record.

[32] *Cf. Taxinet, Corp. v. Leon*, No. 16-24266-COV-MORENO/LOUIS, 2020 WL 4501938, at *8 (S.D. Fla. May 28, 2020) (indicating that when analyzing a statute of frauds defense a "threshold question" is whether there is a contract under applicable law).

[33] Though it declines to address the matter here, the Court observes that Fla. Stat. § 83.05 is silent on the issue of tenant's damages and does not appear to provide a cause of action to either landlord or tenant.

[34] *Nazia, Inc. v. Amscot Corp.*, 275 So. 3d 702, 706 (Fla. Dist. Ct. App. 2019) (quoting *Midgard Mgmt., Inc. v. Park Ctr. Med-Suites, LLC*, 114 So. 3d 302, 307 (Fla. Dist. Ct. App. 2013)).

[35] *See MH New Invs., LLC v. Dep't of Transp.*, 76 So. 3d 1071, 1072 (Fla. Dist. Ct. App. 2011) (citations omitted) ("Since a license to use real property is a privilege to use, not an interest in real property, business damages may not be predicated upon a license to use real property. The terminology used is not dispositive, however. Courts look to what a thing is, not what it is called. By its nature, a license is permissive and readily revocable at the option of the owner."); *Devlin v. The Phoenix, Inc.*, 471 So. 2d 93, 95 (Fla. Dist. Ct. App. 1985) ("A license, whether express or implied, is not a right but is a personal privilege, not assignable without express permission. Not being an interest in land it is not subject to the statute of frauds. A 'license' is defined to be an authority to do a particular act, or series of acts, upon another's land without possessing any estate therein. No consideration is required to create a license. The distinctive characteristic of a license is that it may always be made by parol and that it is, in its very nature, necessarily revocable at will.") (citations omitted)).

always the landlord's right to enter to demand rent or to make repairs. A licensee is one who has a mere permission to use land, dominion over it remaining in the owner and no interest in or exclusive possession of it being given to the occupant.[36]

Upon thorough review, the Court can find nothing in the record to suggest that Plaintiff had a right to possess the Venue exclusive of anyone, much less the Ritz Defendants. Rather, the summary judgment record demonstrates that the parties not only worked together at the Promoted Events but also that the Venue was marketed and used for events other than those promoted by Plaintiff. At oral argument, Plaintiff emphasized it had "24/7 access" to the Venue. But access is equally consistent with a license. And the insurance policy declaration pages that Plaintiff attached to the Complaint, which Plaintiff concedes are not properly part of the summary judgment record, indicate that the policy was in effect only on intermittent dates.[37]

Lacking the right to exclusive possession of the Venue, Plaintiff cannot be said to have had a lease under Florida law such that the provisions of Chapter 83 might apply. Summary judgment in favor of the Ritz Defendants is therefore appropriate as to Count III.

*Count IV – Tortious Interference with Contracts and Business Relationships*

As it stands,[38] Count IV is advanced solely against Mr. Capitano in his individual capacity. The record reflects, however, that Mr. Capitano did not participate in nor financially benefit from the Promoted Events in that capacity. Plaintiff offers nothing more than an unsupported denial to oppose this conclusion.[39] For this reason alone, summary judgment is due

---

[36] *Turner v. Fla. State Fair Auth.*, 974 So. 2d 470, 473–74 (Fla. Dist. Ct. App. 2008) (quoting *Seabloom v. Krier*, 219 Minn. 362, 18 N.W.2d 88, 91 (1945) (internal quotations omitted)).

[37] Compl. Ex. I. Plaintiff's counsel also referenced the correspondence used by the Ritz Defendant to terminate the business relationship which referred to the relationship as a tenancy. Again, these communications, which are found as Ex. J to the Complaint, are not part of the summary judgment record. But even so, it is the terms of the agreement that control the analysis not communications thereafter. For that matter, "terminology used is not dispositive . . . . Courts look to what a thing is, not what it is called." *MH New Invs., LLC*, 76 So. 3d at 1072.

[38] By prior order, summary judgment was granted to John Santoro and Amphitheatre Events, LLC as to Count IV. Doc. 82.

[39] Response ¶ 31.

to be granted.[40]  But here there is more.

The relevant portions of the Complaint do not allege that Mr. Capitano acted outside the scope of his role as agent.[41]  As such, and as conceded by Plaintiff's counsel at oral argument, Plaintiff's claim against Mr. Capitano cannot stand to the extent it is based upon interference with the alleged agreement among Plaintiff, The Ritz, and NCJ.[42]

Nonetheless, to save its claim, Plaintiff argues that it has also alleged that Mr. Capitano interfered with "other" contracts for which he might be held liable.  But these contracts are not identified in the Complaint, much less in response to summary judgment.  And neither the Complaint nor the Response describe any act of interference with these unidentified contracts by Mr. Capitano, as agent or otherwise.  Plaintiff's claim as to these "other" contracts therefore does not even survive an analysis under Rule 12(b)(6).

*Count V – Fraudulent Inducement*

The Ritz Defendants argue that the fraudulent inducement claim fails because the Plaintiff may not circumvent the statute of frauds by bringing an action for fraud.  Plaintiff does not address this argument in its Response.  The Ritz Defendants are, of course, correct on the law.[43]  But their argument, which is as conclusory as the Response is silent, also somewhat

---

[40]  *See Atl. Specialty Ins. Co.*, 793 F. App'x at 902.

[41]  In Count IV, Plaintiff asserts that the actions described in ¶¶ 30–35 constituted the unjustified interference; however, those paragraphs described actions taken by the "Property Owners," which are not defined to include Mr. Capitano.  ¶ 15.  The allegations are consistent with the general allegations that Mr. Capitano "[a]t all relevant times . . . was an actual agent" for The Ritz and NCJ.  ¶¶ 12–13.

[42]  *See Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 6:18-CV-576-ORL-28DCI, 2019 WL 1297964, at *5 (M.D. Fla. Mar. 21, 2019) ("[A]n agent of a party to the contract, 'acting within his capacity and scope as an agent, cannot be considered to be a separate entity outside of the contractual relationship [that] can tortiously interfere with that relationship.'" (quoting *Cedar Hills Props. Corp. v. Eastern Fed. Corp.*, 575 So. 2d 673, 676 (Fla. Dist. Ct. App. 1991)); *West v. Troelstrup*, 367 So. 2d 253, 255 (Fla. Dist. Ct. App. 1979).

[43]  *See, e.g.*, *940 Lincoln Rd. Assocs. LLC v. 940 Lincoln Rd. Enters., Inc.*, 237 So. 3d 1099, 1102 (Fla. Dist. Ct. App. 2017) ("It is well settled that a party cannot avoid the writing requirement of the statute of frauds by reformulating what amounts to a breach of an oral contract claim into a fraud claim."); *LynkUs Commc'ns, Inc. v. WebMD Corp.*, 965 So. 2d 1161, 1166 (Fla. Dist. Ct. App. 2007) ("[U]nder the statute of frauds, 'an action for damages cannot be maintained on the ground of fraud in refusing to perform the [oral] contract, even though the defendant at the time of the making of the oral contract may have had no intention of performing it.'" (quoting

misconstrues the nature of Plaintiff's claims which are not based upon an "oral" contract.

But with the benefit of oral argument, the Court better understands the Ritz Defendants' argument and Plaintiff's response, as well as Plaintiff' underlying claim. And based upon that understanding, the Court concludes that the Ritz Defendants are entitled to summary judgment based upon the application of Florida's independent tort doctrine.[44]

This case is, if anything at all, an action for breach of contract. There is no evidence put forth, nor really any allegation made, of a material misrepresentation by the Ritz Defendants distinct from matters related to the claimed breach of the alleged partnership agreement. Rather, Plaintiff simply takes issue that the Ritz Defendants deny that certain terms Plaintiff believes were made part of the agreement are, in fact, part of that agreement. Said differently, Plaintiff alleges that the Ritz Defendants' promises to perform under the alleged partnership and lease agreements were fraudulent.

In Florida, "[i]t is a fundamental, long-standing common law principle that a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract."[45] While it is true that "fraud in the inducement [may be considered] an independent tort [where] the alleged misrepresentation inducing one to enter into the contract is unrelated to the obligations under the contract,"[46] that is not what Plaintiff claims here. The

---

*Canell v. Arcola Hous. Corp.*, 65 So. 2d 849, 851 (Fla. 1953))).

[44] *See, e.g.*, *Barrakuda Ltd. v. Zazaby Jewels, Inc.*, No. 19-23004-CV-MARTINEZ-OTAZO-REYES, 2021 WL 2454467, at *4–5 (S.D. Fla. May 14, 2021); *Un2jc Air 1, LLC v. Whittington*, No. 4D20-1449, 2021 WL 2672915, at *2 (Fla. Dist. Ct. App. June 30, 2021); *see generally Inspirations Nevada LLC v. Med Pro Billing, Inc.*, No. 20-CV-60268-STRAUSS, 2021 WL 2156677, at *4–5 (S.D. Fla. May 26, 2021) (recognizing that the independent tort doctrine and its related doctrine, the economic loss rule, have "spurred much debate" since the Florida Supreme Court's decision in *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399 (Fla. 2013), yet also acknowledging that since the Florida Supreme Court's decision, Florida's appellate courts have reaffirmed the application of the independent tort doctrine).

[45] *Island Travel & Tours, Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. Dist. Ct. App. 2020); *see Elec. Sec. Sys. Corp. v. S. Bell Tel. & Tel. Co.*, 482 So. 2d 518, 519 (Fla. Dist. Ct. App. 1986) ("It is only when the breach of contract is attended by some additional conduct which amounts to an independent tort that such breach can constitute [an actionable claim in tort].").

[46] *Island Travel & Tours*, 300 So. 3d at 1240 n.7; *see Rossi v. Darden*, No. 16-21199-CIV-

"misrepresentations" alleged relate to the Ritz Defendants' claimed breach under the agreement rather than tortious conduct distinct from the performance under the contract. Accordingly, an action for fraudulent inducement cannot lie.[47]

Because there is no evidence to show a material misrepresentation by the Ritz Defendants separate and apart from the obligations allegedly breached by them, Plaintiff's fraudulent inducement claim is barred by Florida's independent tort doctrine.[48] Summary judgment in favor of the Ritz Defendants is therefore appropriate as to Count V.

For these reasons, it is **ORDERED**:

1. The Motion (Doc. 61) is **GRANTED in part and DENIED in part**, as follows.

2. The Court grants summary judgment in favor of all Defendants on Counts III and V of Plaintiff's complaint.

3. The Court also grants summary judgment in favor of Joseph Capitano, Jr. on Count IV of Plaintiff's complaint.

4. Insofar as the Motion is based upon the statute of frauds, summary judgment is denied on Counts I and II of Plaintiff's complaint, without prejudice. The Ritz Defendants' answer is deemed amended to assert the statute of frauds affirmative defense. By subsequent order, the Court will authorize limited discovery on the affirmative defense as it relates to the remaining two counts of the Complaint.

Service of this Order other than by CM/ECF is not required. Local Rule 9013-3(b).

---

ALTONAGA/O'Sullivan, 2016 WL 11501449, at *9–10 (S.D. Fla. July 19, 2016) (finding that because plaintiffs had alleged that defendants made misrepresentations "materially separate from any fraud that may have occurred during performance of the contract," they had pled a plausible claim for fraudulent inducement separate from their breach of contract claim).

[47] *See Barrakuda Ltd.*, 2021 WL 2454467, at *5; *LynkUs Commc'ns, Inc.*, 965 So. 2d at 1166–67.

[48] *See Lifecell IP Holdings, LLC v. Cosmedique, LLC*, No. 19-CV-60978-RAR, 2021 WL 3038946, at *5–6 (S.D. Fla. June 7, 2021), *report and recommendation adopted*, No. 19-CV-60978-RAR, 2021 WL 3038524 (S.D. Fla. July 19, 2021); *Barrakuda Ltd.*, 2021 WL 2454467, at *5; *Island Travel & Tours*, 300 So. 3d at 1239–40.

# Exhibit "D"

ORDERED.

Dated:  December 08, 2021

_____
Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Hallucination Media, LLC,

        Debtor.

Case No. 8:16-bk-04116-RCT
Chapter 11

_____/

Hallucination Media, LLC,

        Plaintiff,

vs.

Adv. No. 8:19-ap-00134-RCT

The Ritz Ybor, LLC, N.C.J. Investment Company,
Joe Capitano, Jr., Amphitheatre Events, LLC,
and John A. Santoro,

        Defendants.

_____/

**ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION
OF ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT IN PART**

THIS PROCEEDING is considered, with a hearing, on Plaintiff Hallucination Media, LLC's *Motion to Alter or Amend the "Memorandum Decision and Order Granting, in Part, and Denying, in Part Defendants Ritz YBOR, LLC, Joseph Capitano, Jr., and N.C.J. Investment Company's Amended Motion for Summary Judgment" Entered on October 29, 2021 [], in*

*Accordance with Rule 59 of the Federal Rules of Civil Procedure and Rule 9023 of the Federal Rules of Bankruptcy Procedure* (Doc. 99) (the "Motion"); and Defendants Ritz Ybor, LLC, Joseph Capitano, Jr., and N.C.J. Investment Company's (collectively, the "Ritz Defendants") response in opposition to the Motion (Doc. 100). Plaintiff seeks reconsideration of the Court's order granting the Ritz Defendants summary judgment on Counts III, IV, and V of the complaint (Doc. 97) (the "Order"), which, respectively, alleged unlawful eviction under Fla. Stat. § 83.05, tortious interference with contract or business relationships, and fraudulent inducement. The Court granted the Ritz Defendants summary judgment, again respectively, because it determined that (1) Plaintiff lacked the right to exclusive possession such that it might have had a lease under Florida law such that the provisions of Chapter 83 might apply; (2) Defendant Joseph Capitano, Jr. ("Capitano") did not act outside of his capacity as agent and therefore could not be individually liable for tortious interference; and (3) Plaintiff's claim was barred by Florida's independent tort doctrine.

Motions for reconsideration are governed by Federal Rule of Bankruptcy Procedure 9023, which incorporates Rule 59 of the Federal Rule of Civil Procedure ("Rule(s)"). Relief under Rule 59(e) is limited to the following circumstances: "(1) an intervening change in controlling law; (2) newly discovered evidence; or (3) clear error or manifest injustice."[1] Rule 59 is not a vehicle to "relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."[2] Further, "reconsideration of a previous order is an extraordinary remedy to be employed sparingly."[3]

Plaintiff does not point to any change in controlling law or any newly discovered evidence. Instead, Plaintiff seeks reconsideration of the Order based on clear error of fact or law.

---

[1] *Woide v. Fed. Nat'l Mortg. Ass'n (In re Woide)*, No. 6:16–cv–1484–Orl–37, 2017 WL 549160, at *1 (M.D. Fla. Feb. 9, 2017), *aff'd*, 730 F. App'x 731 (11th Cir. 2018).
[2] *Id.* (quoting *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)).
[3] *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002).

Regarding Counts III & IV, Plaintiff asserts that the Court misapplied Rule 56 by deciding issues and reaching arguments not raised by the Ritz Defendants' Amended Motion for Summary Judgment (Doc. 61) (the "Summary Judgment Motion"). It argues that because the issues and arguments were not raised in the Summary Judgment Motion, the Ritz Defendants could not have met their burden on the motion and consequently, the burden did not shift to Plaintiff to show the existence of a triable issue of fact. Plaintiff cites, specifically, the issues of whether there was a lease or license as to the performance venue and whether Capitano moved for summary judgment as to the alleged "other contracts."[4] The Ritz Defendants respond that the salient issues, *i.e.*, that the Ritz Defendants claimed that no lease existed and that Capitano at all times acted solely in a representative capacity, were raised in the Summary Judgment Motion and thus, were properly noticed for adjudication and decided by the Court.

Regarding Count V, Plaintiff argues that the case law cited by the Court does not support granting summary judgment as Plaintiff did, in fact, allege misrepresentations unrelated to the obligations imposed under the contract between the parties.[5] Acknowledging the Summary Judgment Motion may not have been a "model of clarity" as to this count, the Ritz Defendants respond that the legal issue of the application of the independent tort doctrine was raised and Plaintiff failed to respond with anything more than the unsubstantiated allegations in the complaint. The Ritz Defendants also note that Plaintiff's counsel conceded at oral argument that

---

[4] Plaintiff emphasizes Rule 56's requirement that the movant "identify[] each claim or defense." Plaintiff appears to equate "argument" with "claim;" however, the latter is a broader term as demonstrated by the next phrase in the rule, *i.e.*, "or the part of each claim or defense." Afterall, a claim or defense may be supported by several arguments. Plaintiff's contention suggests a type of formalism that was abandoned for the more liberal notice standard upon the adoption of the Federal Rules of Civil Procedure.

[5] Plaintiff cites, as example, paragraph 56 of its complaint. However, that paragraph simply alleges that the promises made by the Ritz Defendants were false and known to be false at the time that they were made. It does not establish misrepresentations separate and apart from the obligations arising under the alleged contract. But even if the paragraph did what Plaintiff claims, the complaint is not verified, and thus, as noted in the Order, is not properly considered as part of the summary judgment record. Order at 2 n.1

summary judgment on this count could be granted.

Upon review of the Motion, the Court finds that Plaintiff has not demonstrated a proper basis under Rule 59 to warrant the "extraordinary remedy" it seeks. As before, Plaintiff largely relies on conclusory statements and unsubstantiated allegations. Further, even if Plaintiff were correct, given that counsel raised these same concerns at oral argument, it is telling that he did not request additional time either for further discovery or to supplement his response[6] as he did regarding the issue of the statute of frauds.

As articulated by the Ritz Defendants in response to the Motion, the issues upon which the Court's ruling rests were raised by the Ritz Defendants in the Summary Judgment Motion. And with respect to Count V, the legal issue of the application of Florida's independent tort doctrine is apparent on the face of the complaint. While the Court respects the Plaintiff's right to disagree, that is a matter properly directed to the district court on appeal.[7]

Accordingly, it is **ORDERED** that the Motion (Doc. 99) is **DENIED**.

Service of this Order other than by CM/ECF is not required. Local Rule 9013-3(b).

---

[6] Fed. R. Civ. P. 56(d) incorporated herein by Fed. R. Bankr. P. 7056.
[7] *Cf. Gormley v. Parker*, 180 F. App'x 905, 905 (11th Cir. 2006).

# Exhibit "E"

ORDERED.

**Dated:  February 22, 2022**

_(signature)_

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

Hallucination Media, LLC,

          Debtor.

_____

Hallucination Media, LLC,

          Plaintiff,

v.

The Ritz Ybor, LLC, N.C.J.
Investment Company, Joseph
Capitano, Jr., Amphitheatre Events,
LLC, and John A. Santoro,

          Defendants.

_____/

Case No. 8:16-bk-04116-RCT
Chapter 11

Adv. No. 8:19-ap-00134-RCT

**ORDER GRANTING DEFENDANTS RITZ YBOR, LLC AND
N.C.J. INVESTMENT COMPANY'S AMENDED RENEWED MOTION FOR
SUMMARY JUDGMENT ON COUNTS I AND II OF PLAINTIFF'S COMPLAINT**

     This adversary proceeding is before the Court on Defendants Ritz Ybor, LLC and N.C.J.

Investment Company's Amended Renewed Motion for Summary Judgment on Counts I and II of

Plaintiff's Complaint ("Motion").  (Doc. 115).  Plaintiff opposes the Motion.  (Doc. 122).  As explained below, the Motion is granted as to both counts.

## I.  Jurisdictions and Standard of Review

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(c)(1).  It is a non-core related matter arising out of the Chapter 11 bankruptcy of Hallucination Media, LLC ("Hallucination"), case number 8:16-bk-04116-RCT.  The parties consented to this Court's jurisdiction, and when the Court ruled that Hallucination was entitled to a jury trial, the parties consented to this Court conducting a jury trial.[1]

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[2] The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.[3]  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.[4]  When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial.[5]

---

[1] Defendants sought to strike Hallucination's jury trial demand, and during a hearing on June 23, 2020, the Court denied the motion.  (Doc. 42).  During a November 17, 2020 hearing, the parties informed the Court that they consented to the bankruptcy court conducting the jury trial.
[2] Fed. R. Civ. P. 56(a) as incorporated by Fed. R. Bankr. P. 7056.
[3] *See Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).
[4] *See id.* (citation omitted).
[5] *See id.* (citation omitted).

## II. Background

Defendant Ritz Ybor, LLC ("Ritz") operated a special events venue in a building that was owned by Defendant N.C.J. Investment Company ("NCJ") and leased to Ritz. (Doc. 120-2, p. 3; Doc. 120-6, p. 4-16). Joseph Capitano, Jr. was a managing member of Ritz, and he was a shareholder and the secretary of record of NCJ. (Doc. 120-2, p. 2-3). Capitano, Jr. was an agent of Ritz, and he held himself out as an agent of NCJ. (Doc. 121, p. 3).

Plaintiff Hallucination is managed by Bryan Nichols and Steve "Monk" McClure. (Doc. 121, p. 3). In May of 2013, Ritz and NCJ began discussions with Hallucination about entering into an agreement for Hallucination to promote and produce club nights at Ritz on Friday and Saturday nights. (Doc. 120-2, p. 4). Many of these communications are documented in emails, which are central to this case. Hallucination promoted and produced club nights at Ritz on Friday nights and some Saturday nights between August 2013 and May 2016, when the business relationship between the parties ended poorly.

After their relationship ended, Hallucination initiated this adversary proceeding against Ritz, NCJ, and others. Only two claims and two defendants remain.[6] In Count I, Hallucination contends that Ritz and NCJ breached a three-year partnership agreement with Hallucination. (Doc. 2). In Count II, Hallucination contends that Ritz and NCJ breached a right of first refusal given to Hallucination to continue using the event space after their partnership ended. (Doc. 2).

---

[6] When Hallucination initiated this adversary proceeding, it asserted five claims against five defendants: (1) Count I: breach of partnership agreement against Ritz and NCJ; (2) Count II: breach of right of first refusal against Ritz and NCJ; (3) Count III: self-help eviction against Ritz, NCJ, and Capitano, Jr.; (4) Count IV: tortious interference with business relationships against Capitano, Jr., Amphitheatre Events, LLC, and John Santoro; and (5) Count V: fraudulent inducement against Ritz, NCJ, and Capitano, Jr. (Doc. 2). Defendants Amphitheatre Events, LLC and John Santoro (a rival club and its owner) moved for summary judgment as to the tortious interference claim asserted against them in Count IV, and the Court granted their motion. (Doc. 82). Thereafter, Defendants Ritz, NCJ, and Capitano, Jr. moved for summary judgment on the claims asserted against them, and the Court granted their motion as to Counts III, IV, and V; the Court denied the motion as to Counts I and II. (Doc. 97).

Ritz and NCJ now move for summary judgment on the remaining two counts, arguing that the statute of frauds bars the enforcement of both agreements because neither could be performed within one year.[7]  To overcome the statute of frauds, Ritz and NCJ argue that there must be: (1) some writing, note, or memorandum, (2) signed by Ritz and NCJ or their representatives, (3) that evidences the alleged three-year partnership agreement and Hallucination's alleged right of first refusal.

Hallucination responds that the numerous emails in the record are writings that evidence the alleged three-year partnership agreement and Hallucination's alleged right of first refusal. Many email communications come from Stephanie Petrucelli, who is Capitano, Jr.'s agent for Ritz. (Doc. 120-2, p. 4).  Hallucination extrapolates that because Petrucelli was Capitano, Jr.'s agent, and because Capitano, Jr. held himself out as NCJ's agent, Petrucelli was also the apparent agent of NCJ.

### III.  The Emails

The first relevant email is from Petrucelli to Hallucination on May 21, 2013, and it says, "Attached are some talking points from our last sit down."  (Doc. 120-4, p. 22).  One attachment to this email states:

**Hallucination/Ritz Ybor Promotion Agreement Talking Points**

- Capital improvements Ritz committed to spend $275,000 on an agreed upon scope

- Capital costs amortized at $1.00 per paid head Friday and $2.00 per paid head Saturday. Note that increased capital outlays due to

---

[7] Ritz and NCJ did not assert the statute of frauds as an affirmative defense in their answer to the complaint. (Doc. 13).  However, they raised the issue in their prior motion for summary judgment (Doc. 61), and when ruling on that motion, the Court deemed their answer to the complaint to be amended to assert the statute of frauds affirmative defense (Doc. 97).  After ruling on their first motion for summary judgment, the Court reopened discovery on the statute of frauds affirmative defense to the extent that it related to Counts I and II.  (Doc. 97).

purchase of Czar equipment may require increased per paid head amounts to amortize.

- Term: 3 years – on Friday and Saturday
Friday – Ritz dark to other parties / events. Other events cleared out by 9pm and agreed by parties
Saturday – Continue to promote events & live shows – cleared out by 12am

- If for any reason $275,000 is not fully amortized at end of 36 months, Ritz has the option but not the obligation to extend the term of this agreement until the initial capital outlay is fully amortized. See revenue pro forma and amortization schedule for projected numbers.

- Need to discuss possible other night promo's Ritz may have with alternative promoters

- Hallucination (Monk & Brian) will not promote club nights similar to that being held at Ritz until 3 years or amortization of improvements for 100 mile radius. (To be discussed). This prohibition is not meant to apply to one-off festivals of the type that may be held outdoors and/or attract greater than 2,000 people.

-If Hallucination breaches prior to 3 year or amortization, Monk & Brian will be personally responsible for 125% of the unamortized cost to Ritz. (For Discussion)

- If Ritz terminates the agreement other than for cause prior to the expiration of the 3 year term, damages owed to Hallucination will be equal to the present value of the prior year's average weekly revenue discounted at 10% (For Discussion). Hallucination will also have a Right of First Refusal should Ritz seek to enter into a long-term lease or sale of the Ritz building.


COMMENTS TO HALLUCINATION TALKING POINTS

**Media Terms** – we have used the concept of a right of first refusal on the property in lieu of establishing a pre-determined percentage of some undefined future deal.

> **Friday Nights** – Ritz may need some ability to govern music styles due to Ybor City community presence of owners
>
> **Saturday Nights** – we propose a sliding scale for the sharing of bar sales (see revenue proforma Note 1
>
> **Co-Promoted Special Events** – we are available for more discussion on this topic and willing to work together under terms fair to both parties and consistent with other agreements we have used previously.
>
> **Hallucination Promoted Parties** – we would like to limit these functions to one per calendar quarter. Any in excess would require our consent. We propose using the same sliding scale for bar sales as proposed for Saturday nights.
>
> **Outside Promoters** - we are available for more discussion on this topic and willing to work together under terms fair to both parties and consistent with other agreements we have used previously.

(Doc. 120-4, p. 22-26).

 Also attached to the May 21, 2013 email is a financial pro forma that appears to project the split of the door revenue and bar revenue between Ritz and Hallucination, as well as a breakdown of the remodel budget. (Doc. 120-4, p. 27-30). According to the spreadsheet, the Friday door revenue was to be split with the first dollar charged per person to enter the club going to Ritz, and the remaining door revenue being split 50/50. (Doc. 120-4, p. 27). The Saturday door revenue split based on the spreadsheet is less clear, as the numbers do not add up.[8] (Doc. 120-4, p. 27). But, according to the body of the email, the Saturday door revenue was to be split with the first two dollars charged per person to enter the club going to Ritz. With regard to the split of the bar revenue, the spreadsheet shows: (1) Friday nights – 90% to Ritz and 10% to Hallucination; and (2) Saturday nights - 95% to Ritz and 5% to Hallucination. (Doc. 120-4, p. 27).

---

[8] The spreadsheet reflects projected Saturday door revenue to be $4,500 with $5,000 going to Ritz and $500 going to Hallucination. (Doc. 120-4, p. 27).

Later on May 21, 2013, Hallucination emailed Petrucelli in response stating, in part, that "[a] few things from your attachments were very concerning to us."  (Doc. 120-4, p. 32). Hallucination communicated that: (1) it needed 100% control over the music style; (2) it could not agree to increasing the $1/Friday and $2/Saturday "off the top" headcount payments to the Ritz for the capital outlay; and (3) it wanted to know how things would change once the capital outlays were paid back—would Hallucination own any of the property and/or would it obtain a profit-sharing percentage and/or own a piece of the business or building.  (Doc. 120-4, p. 32-33).

On June 7, 2013, Petrucelli again emails Hallucination, stating: "Attached is a few edits to some of our discussion so we can take the next step to develop a document.  I know there is some language needed from you guys….I highlighted those areas in red.  Let me know your thoughts." (Doc. 120-4, p. 35).  The two edits proposed by Petrucelli consisted of the following: (1) after the "Term" talking point of "3 years – on Friday and Saturday," Petrucelli added "[BRYAN TO PROVIDE LANGUAGE TO ADDESS OPTIONS TO EXTEND OR ROFR[9]];" and (2) after Ritz's comment to the "Friday Nights" section, Petrucelli added "[BRYAN TO DRAFT LANGUAGE ADDRESSING CONCEPT OF GOVERNANCE IN SITUATIONS IN WHICH INCIDENTS OR NUISSANCE HAVE BEEN DEMONSTRATED]."  (Doc. 120-4, p. 36-37).

On June 11, 2013, Petrucelli sent a follow-up email to Hallucination and stated the following: "Just wanted to check in to see where you are on the language that we need from your team to move forward to finalize an agreement.  Joe [Capitano] Jr[.] leaves Monday 6/17 for 2 weeks to Europe and I would like to have a good base before he is gone.  Look forward to hearing from you."  (Doc. 120-5, p. 2).

---

[9] "ROFR" refers to a right of first refusal.

The next day, June 12, 2013, Hallucination responded with an email containing several changes, stating:

> Here are the changes to the agreement we would like. We would like to set up a meeting with everyone tomorrow, if possible, but definitely before Joe leaves so we are all on the same page.
>
> We feel it is now time to move forward with calendar restrictions and guidelines that make sense for the club. All scheduled events need to be approved by all parties. With a major portion of club revenue and payback falling on Saturday club nights, the events approved will have to be restricted to potential live shows or special events/djs that make sense within the "scene" and "vibe" of the club. This will be vital for us to do our job and consistently promote and generate revenue as a club, weekly.
>
> --------------------
> Changes
> --------------------
>
> Term:
> This is for a 3 year term and shall be automatically renewed in 1 year increments for a maximum of 3 renewals. Changes to this agreement can be made with a 90 day notice and agreement from all parties.
>
> Friday - Ritz dark to other parties / events. Other events cleared out by 9pm and agreed upon by both parties
>
> Saturday - With agreement of all parties, continue to promote events & live shows - Saturday events to take place in theatre only. front two rooms cleared out by 9pm to open doors for weekly. Theatre cleared out by 11 pm (12am for live shows) in in [sic] order to open up the rest of club for weekly.
> Additional days are open for any form of events or parties with no restrictions & with agreement in advance from all parties
>
> -----------------
> {regarding non-compete}
>
> Hallucination (Monk & Bryan) will not promote weekly club nights similar to that being held at Ritz until 3 years or amortization of improvements for 70 mile radius. Where parties agree to events, this prohibition is not meant to apply to one-off club events or festivals.

Parties do agree this provision is meant to prohibit regular DJ style shows from being done on a weekly recurring basis.

----------------
{regarding terminating agreement}

This should be limited to the changes that are taking place for production (items that can be removed) and not that of the building of bars and general improvement to the building. Hallucination & Czar are two separate entities and should be treated as production (hallucination) vs club night management (czar)

- If Hallucination breaches prior to 3 year or amortization, Monk & Bryan will be personally responsible for 125% of the unamortized cost to Ritz. (For Discussion)

----------------
{regarding smoking}

We need to keep the club nights 100 percent consistent with how they have been and not make changes to how people go out and their habits within the party, as already discussed with Joe on multiple occasions.

This is a huge deal and will turn people off to our party. We have a formula, 3 distinct styles of music and people are not going to want to leave their friends to go smoke in another room. It's a "party" not a "live show" or "wedding". We, as promoters cannot guarantee short/long term effects financially by changing our formula. Ultimately, it will be detrimental to the money flow, the party vibe, and our competitors capitalizing on this issue (using it against us). Don't jeapordize [sic] a minimum of $1.5 million dollar in club revenue for a few mixed-use parties.

Simply put, this would be a deal breaker for us.

----------------
{regarding governing music styles}

For ALL Nights.
If a major incident occurs (definition to be discussed) then all parties shall meet to discuss the appropriate action.

A major incident can happen for multiple reasons (staff, entertainment, procedure, etc) and the best way to handle is to have all parties involved if something like this occurs. Directly relating

9

an incident to a music style or on a particular night would be an inaccurate way of addressing an incident.

------------------
{regarding Hallucination Promoted Parties}
We would like to take off the "two per calendar quarter" and just keep it at 5 per year. We never know exact dates of parties and some may fall in same quarter.

-----------------

Bar incentive - Saturday & Special events
We would like to see this as this:
Bar must hit $5,000, once it does the bar incentive takes effect
5% - $0-$5,000
10% - $5,001-$10,000
15% - $10,001 -$20,000
20% - over $20,000

-----------------

TO BE DELETED: Note that increased capital outlays due to purchase of Czar equipment may require increased per paid head amounts to amortize.

-----------------

ADDITIONAL: we need to set amortization to include agreed upon portion of all events, including a portion of bar proceeds, to contribute to the payback of loan. Percentage amounts to be discussed and agreed upon by both parties.

(Doc. 120-5, p. 3-4).

Later on June 12, 2013, Petrucelli emails Hallucination the following response:

Thanks for your response. Joe will give you a call this afternoon.

In the meantime, please see a few brief responses to your comments to help foster this thing a long [sic] and keep us on the same page.

Joe is extremely busy with his core business at the moment along with preparing for his trip and again we wanted to send you a timely response to keep things moving. He will do his best to make himself available for a meeting prior to his departure. However doesn't [sic] feel there is any major reason for concern amongst either party and

feels confident that we will get aligned and strike an agreement that is favorable for us all. In the event that time does not allow for a meeting before his departure we can arrange one shortly after his return the first of July.

Regarding calendar restrictions and guideline for the club ... we recognize that need to preserve the club scene and vibe. As a way to transition on this issue might be to begin focusing on [e]vents that will end after a certain time on Saturday ... say 10 pm as example.

**for example if we have a wedding at 3 pm and finished at 8 pm we are not going to seek approval amongst the parties**

Term:
This is a 3 year term. I understand Hallucination continues to want to be protected beyond that. It seems the most prudent way to do this would be for certain first right of refusal regarding club nights etc at the end of the term (practically speaking if this venture is successful then it would make sense to continue accordingly)

Friday - Ritz dark. All parties agree

Saturday - We want to review what time clearing out the front 2 rooms ... maybe 10 pm can work as a transition as a compromise. Theatre cleaned out by 11 pm and 12 am for live shows seems reasonable.

Additional days are open for any events or parties with no restrictions. (will not stipulate to seeking agreement from the parties on non- club nights)

Non-compete language - seems fair / agreed to.

Regarding terminating agreement- I think I understand what you were suggesting. We can discuss when I call you.

Smoking: understand your concern ... by no means do we want to kill a deal over this. We probably need to discuss further to make everyone comfortable.

Governing music styles - seems like we are on the right track. We will probably have legal add in some nuisance type language.

Hallucination promoted parties: I understand ... 5 per year is fine.

Bar incentive scale to stay as previously proposed. We can revisit this sometime in the future when the club can demonstrate it can cash flow it [sic] obligations.

Additional amortization of all events: although I understand where you are trying to head here. The improvements are being considered and made in an attempt to create the appropriate vibe to accommodate CZAR club night and ensure their continued success. However, subsequent to the improvements, if we do find a tangible per head increase in our other events and live shows we would be willing to consider this at that time.

Please take a few minutes to review the above comments and Joe will call later today. Are you available tomorrow for a phone call at 11:30 or Friday at 11:30 in the event that we are unable to schedule a meeting.

Thank you,
Stephanie

(Doc. 120-5, p. 5-6).

## IV.  Motion for Summary Judgment

Although it is undisputed that there was a business relationship between Hallucination and Ritz that afforded Hallucination a license to hold club events on certain nights and for which Ritz and Hallucination split the door revenue and bar revenue in some manner, the parties dispute whether this business relationship was ever formalized into a three-year partnership agreement with automatic renewals and a right of first refusal for Hallucination when the partnership ended. Ritz and NCJ now move for summary judgment on their deemed statute of frauds affirmative defense. They argue that the statute of frauds bars the enforcement of the alleged agreements because of the lack of evidence in the record of: (1) some writing, note, or memorandum, (2) signed by Ritz and NCJ or their representatives, (3) that evidences the alleged three-year partnership agreement and Hallucination's alleged right of first refusal.

Hallucination responds to the Motion by arguing that the emails described above show that a three-year partnership agreement was entered into by Hallucination, Ritz, and NCJ that began on June 13, 2013.  (Doc. 121, ¶ 7-8).  Hallucination further contends that these emails show that the partnership agreement contained three automatic one-year renewals and that the first one-year renewal was triggered, extending the partnership agreement through June 12, 2017.  (Doc. 121, ¶ 7-8).  Finally, Hallucination argues that these emails show that Hallucination was given a right of first refusal to use the event space after the partnership ended.

No one argues that the parties entered into a formal, signed partnership agreement or even initialed or otherwise acknowledged a final term sheet.  The only "writings" before the Court are emails (and attachments).  Furthermore, no one argues or suggests that the business relationship (whatever its intended form) was or could have been consummated within one year. So, it is clear that the statute of frauds applies, and the Court is left to determine whether, as a matter of law, agreement on the essential terms a partnership and a right of first refusal can be discerned from the emails and attachments referenced in the deposition and affidavits that constitute the summary judgment record.[10]

### A.  Statute of Frauds

Florida's Statute of Frauds provides, in relevant part, the following:

> No action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

---

[10] In the Motion (Doc. 115), Ritz and NCJ refer to the deposition of Nichols and McClure, but their depositions are not filed in the record, and thus, their deposition testimony cannot be considered by the Court.

Fla. Stat. § 725.01.  Here, Hallucination seeks to enforce a three-year partnership agreement and a right of first refusal after the partnership ends. Not surprisingly, in its response to the Motion, Hallucination does not argue that the statute of frauds does not apply to both Counts I and II.

The statute of frauds applies. But to establish the statute of frauds affirmative defense, Ritz and NCJ must show the absence of: (1) some writing, note, or memorandum, (2) signed by Ritz and NCJ or their representatives, (3) that evidences the alleged three-year partnership agreement and Hallucination's alleged right of first refusal.  Once that is established, the burden shifts to Hallucination, who "must do more than simply show that there is some metaphysical doubt as to the material facts."[11]  Instead, Hallucination must demonstrate that sufficient evidence exists to create a material issue of fact for a jury to determine that enforceable agreements exist. Thus, more than a scintilla of evidence, and more than a colorable argument, is necessary to create a genuine issue of material fact and preclude summary judgment.

### B.  Elements of an Enforceable Agreement

In order for Hallucination to succeed on its claims, it must show that an enforceable partnership agreement exists, as well as an enforceable right of first refusal.   In evaluating Hallucination's contention that such agreements exist, this Court is mindful of the following:

> In Florida, an enforceable contract exists only if, among other things, the parties to the contract have sufficiently defined all essential terms of the agreement.  The creation of a contract requires that there be mutual assent to a certain and definite proposition.  If the essential terms [of the contract] are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract.
> 
>        *   *   *
> 
> A mere agreement to agree is unenforceable as a matter of law.  And, similarly, a contract containing ambiguous material terms is unenforceable because the parties never reached a meeting of the

---

[11] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted).

minds regarding an essential term of the agreement.[12]

As explained below, the Court finds that there is no evidence of a mutual assent to essential terms of an enforceable contract.  And given that the statute of frauds applies to these alleged agreements, the essential terms must be set forth in some sort of writing signed by Ritz and NCJ.  Instead, the evidence before the Court simply shows that the parties were discussing, in an attempt to agree on, the materials terms of such agreements, but mutual assent to the essential terms of such agreements has not been shown.[13]

### 1.  Count I: Breach of Partnership Agreement

In Count I of its complaint, Hallucination contends that Ritz and NCJ entered into an enforceable three-year partnership agreement that began on June 13, 2013 and that was extended through June 12, 2017 via a one-year automatic renewal.  This basic premise is flawed for three reasons.

First, even if Hallucination could show the emails established a three-year partnership agreement, there is no evidence that Ritz or NCJ ever agreed to an automatic renewal or that the alleged automatic renewal was triggered.  The first mention of an automatic renewal came from Hallucination's June 12, 2013 email to Petrucelli in which Hallucination stated, in relevant part:

> Here are the changes to the agreement we would like.
>
> *       *       *
>
> Term:
> This is for a 3 year term and shall be automatically renewed in 1 year increments for a maximum of 3 renewals. Changes to this agreement can be made with a 90 day notice and agreement from all parties.

---

[12] *Aldora Aluminum & Glass Products, Inc. v. Poma Glass & Specialty Windows, Inc.*, 683 Fed. Appx. 764, 767–68 (11th Cir. 2017) (internal citations and quotation marks omitted).

[13] *See Balter v. Pan American Bank of Hialeah*, 383 So. 2d 256, 257 (Fla. 3d DCA 1980) (concluding that there was not an enforceable contract, because the parties were still engaged in negotiations regarding the essential terms, and agreement to those terms had not yet been reached).

(Doc. 120-5, p. 21).  In response, Petrucelli emailed Hallucination later on June 12, 2013 and stated, in relevant part:

> Term:
> This is a 3 year term. I understand Hallucination continues to want to be protected beyond that. It seems the most prudent way to do this would be for certain first right of refusal regarding club nights etc at the end of the term (practically speaking if this venture is successful then it would make sense to continue accordingly)

(Doc. 120-5, p. 25).  This is not evidence of any agreement to an automatic renewal; if anything, Petrucelli's response suggests that the concept of automatic renewal was rejected in favor of some type of right of first refusal.

Second, the email communications between the parties are insufficient to create a material issue of fact regarding the essential terms of a three-year partnership agreement.  Yes, the parties were working towards a business relationship of some type that involved the use of Ritz's space for events promoted by Hallucination, but they never got beyond the outline of a license/promoter agreement in any writing.  In fact, the "talking points" document relied on by Hallucination is entitled "Hallucination/Ritz Ybor Promotion Agreement Talking Points"—there is no mention of a partnership/joint venture and no mention of NCJ.

To emphasize the lack of agreement, on June 12, 2013, Petrucelli emailed Hallucination, stating, in part, that Joe Capitano, Jr. "feels confident that we will get aligned and strike an agreement that is favorable for us all."  (Doc. 120-5, p. 5).  This is the last writing prior to the alleged beginning of the partnership term.

The emails offered by Hallucination do not even establish agreement to the material terms of a promotion agreement.  Hallucination wanted to have events on both Friday and Saturday nights, and this was a material term to Hallucination.  Yet, the emails after June 13, 2013—the

alleged beginning of the partnership term—show that the parties were still not on the same page on the issue of Saturday nights and were still negotiating.

On September 4, 2014, Hallucination emailed Petrucelli and stated, in relevant part:

> With regards to exclusivity.
> We cannot be exclusive for just one night guarantee and have a non-compete for 3 years. We need the ability to grow the brands. we rely on a minimum of two nights in this industry in order to succeed, [sic] However, we are 100% on board with working with the Ritz on events that may take over the entire venue on a Saturday[.] We have already agreed to the three Latin nights Oct 3rd, Nov 7th & Dec 5th. We have made adjustments so that the agreement is fair and respectful of both Ritz and Hallucination [sic] interests.

(Doc. 120-2, p. 25).  Later that day, Petrucelli responded via email, stating, in relevant part:

> We appreciate your creative suggestions for Saturday, however, we are not going get there at this time.  As you are aware, Saturdays have been losing money for months. In fairness to the venue we need some time to evaluate the new structure of operating in the front two rooms and on what to expect and how to proceed. You guys have asked for us to give you the opportunity and we have agreed to do so.
>
> Again, your suggestions are probably not to [sic] far off. However, we cannot risk locking the venue up to a firm commitment financially [of a $15,000 guaranteed minimum in order for others to use the space on Saturdays] until we have more numbers to evaluate.
>
> On Saturdays promo, we are agreeable to making an evaluation on a [sic] ongoing basis with the remainder of calendar year. Although we understand your desired control over front [sic] two rooms. It's difficult for us to be locked into a written agreement when Saturdays have been at a lose [sic]. Assuming things are positive for Saturdays over the next few months, it would allow us to consider some of the restrictions and limitations you are suggesting.
>
> \*       \*       \*
>
> To help better protect you we are willing to stipulate that if due to financial or market conditions that we are unable to agree to the uninterrupted access as requested then we would be willing to release Hallucination from exclusivity on Saturdays.

> We really need to trust each other on Saturdays and move forward with this issue to get this buttoned up.
>
> Respectfully, our stance on Saturday is firm. Again we can protect you with removal from exclusivity in the event we are unable to agree moving forward.

(Doc. 120-2, p. 24). The next day, Hallucination emailed Petrucelli in response, stating, in relevant part:

> We are clearly in a stalemate with the Saturday issue.
>
> *    *    *
>
> [F]or us to agree to any of this, we stand firm on needing Saturdays in conjunction with our "non-compete" and "exclusivity". Otherwise we just become a promoter as opposed to promotional partner, and this will involve the need to restructure our entire agreement.

(Doc. 120-2, p. 23). Petrucelli responded: "We would like to reinforce to you again that we are willing to remove the Saturday non-compete restriction until such time that a Saturday arrangement can be agreed to by all." (Doc. 120-2, p. 22).

The emails (the writings alleged to overcome the statute of frauds) show that even more than a year after their discussions began, the business relationship remained a work in progress, and they still had not come to any final agreement on all of the essential terms for a three-year partnership agreement. This is not to suggest that there was not a business relationship between the parties and some general agreement for the use of the premises and sharing of revenues — just that there is insufficient evidence of any agreed writing of a joint venture or partnership.[14] The emails indicate nothing more than Ritz permitted Hallucination to promote events when it made financial sense for Ritz to do so.

---

[14] Because Hallucination seeks damages, partial performance cannot overcome Ritz and NCJ's statute of frauds affirmative defense. *See Dwight v. Tobin*, 947 F.2d 455, 459 (11th Cir. 1991) (stating "while the courts may use the doctrine of part performance to remove a contract from the statute of frauds for the purpose of granting specific performance or other equitable relief, the doctrine is not available in an action solely for damages at law").

Third, to establish a partnership or joint venture agreement, four elements must exist:

> Under Florida law, a joint venture is a form of partnership, and both types of entities are generally governed by the same rules of law. A partnership is created only where "both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business." A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control. Florida courts have interpreted these requirements to preclude a finding that a partnership or joint venture exists where any factor is missing.[15]

Here, at a minimum, the right to share profits and the duty to share losses is missing from the emails between Hallucination and Ritz. While there are emails that address revenue sharing (although the precise formula is still unclear to the Court), an agreement to share revenue is not the same as an agreement to share profits. Furthermore, no evidence has been offered of shared expenses or losses beyond repayment of the cost of the club remodeling from the door revenue. Some emails indicate that the remodeling costs paid by Ritz could be recouped by increasing Ritz's allocation of door revenues. But this is not the same as Hallucination agreeing to be directly liable for any of those costs. If the Hallucination club nights did not generate sufficient door revenue to pay back the cost of the club remodel over the alleged three-year term, Ritz was on the hook for the remaining remodeling costs, not Hallucination.[16] A partner or joint venturer would be expected to share losses. "To share in losses means that each party is responsible or liable for the losses

---

[15] *Williams v. Obstfeld*, 314 F.3d 1270, 1275–76 (11th Cir. 2002) (internal citations omitted).

[16] One of the "talking points" contained in Petrucelli's May 21, 2013 email states: "If Hallucination breaches prior to 3 year or amortization, Monk & Brian will be personally responsible for 125% of the unamortized cost to Ritz. (For Discussion)." Given that this "talking point" was still under discussion, and given that there has been no suggestion that Nichols and McClure, individually, would be parties to any alleged partnership agreement, this is not evidence of an agreement for Hallucination to share in the losses of the alleged partnership.

created by the venture and is exposed to liability, if any, to creditors or third parties."[17]   At best, the effort to use the first dollars from door revenue towards the remodel cost was an aspect of the allocation of door revenues.  It does not reflect the assumption of any liability for such costs by Hallucination.

Thus, the Court finds that there is not sufficient evidence of an agreed writing signed by Ritz and NCJ to overcome the statute of frauds affirmative defense to the enforcement of the alleged three-year partnership agreement, much less an agreement for a one-year renewal.[18] Summary judgement on Count I is appropriate.

### 2.  Count II: Breach of Right of First Refusal

In Count II of its complaint, Hallucination seeks to enforce an undefined right of first refusal to continue using Ritz's space for events after the termination of the alleged three-year partnership agreement.  Since this could not possibly occur within one year, the statute of frauds applies to this alleged agreement.[19]

In its response to the Motion, Hallucination describes the specific writing that it relies on to show the existence of the right of first refusal as "Exhibit 7, Bates page 95" to Joseph Capitano,

---

[17]   *S & W Air Vac Systems, Inc. v. Department of Revenue, State of Fla.,* 697 So. 2d 1313, 1316 (Fla. 5th DCA 1997) (citation omitted).

[18] The Court notes that even assuming arguendo that a three-year partnership agreement did exist (and the Court finds that it did not), any alleged breach of the three-year partnership agreement would only result in one month's worth of damages.  Hallucination contends that the partnership agreement began of June 13, 2013, and Hallucination's last event with Ritz occurred on May 13, 2016—one month before the June 12, 2016 end of the alleged three-year partnership term.

As for resulting damages, the "talking points" refers to the following: "If Ritz terminates the agreement other than for cause prior to the expiration of the 3 year term, damages owed to Hallucination will be equal to the present value of the prior year's average weekly revenue discounted at 10% (For Discussion)."  (Doc. 120-4, p. 37).  However, that damages calculation was still under discussion.  In preparation for trial, Hallucination stated that its damages for breach of the partnership agreement from May 2016 through August 2016 (a longer period for damages than would even be available) was $42,000, based on lost profits and not the formula in the alleged partnership agreement.  (Doc. 139, p. 4).

[19] The statute of frauds applies  if full performance of the agreement is impossible within a year.  *See Taxinet, Corp. v. Leon*, NO. 16-24266-CIV-MORENO/LOUIS, 2020 WL 4501938, at *5 (S.D. Fla. May 28, 2020) (citations omitted).

Jr.'s deposition.  (Doc. 122, p. 15).  While Exhibit 7 does not contain Bates page 95, both Exhibit 7 and Bates page 95 contain the following language:[20]

> If Ritz terminates the agreement other than for cause prior to the expiration of the 3 year term, damages owed to Hallucination will be equal to the present value of the prior year's average weekly revenue discounted at 10% (For Discussion). **Hallucination will also have a Right of First Refusal should Ritz seek to enter into a long-term lease or sale of the Ritz building.**

(Doc. 120-4, p. 37; Doc. 120-4, p. 25) (emphasis added).

Unfortunately, Hallucination does not point to any writing where Ritz or NCJ actually agreed to this type of right of first refusal.  Although the concept of a right of first refusal was discussed, and in the course of negotiations Petrucelli sought language from Hallucination regarding the same, the nature, terms, and scope of a right of first refusal was never documented in any writing or agreed to by Ritz or (perhaps more importantly) NCJ.  Agreeing to discuss the concept of a right of first refusal is not sufficient; instead, there must be a final agreement as to the material terms signed by Ritz and NCJ.

A right of first refusal is first mentioned in an attachment to the May 21, 2013 email from Petrucelli to Hallucination.  However, on June 7, 2013, Petrucelli emails Hallucination, stating: "[BRYAN TO PROVIDE LANGUAGE TO ADDESS OPTIONS TO EXTEND OR ROFR]."  (Doc. 120-4, p. 36).  At this point, options are on the table, but there is no agreement. And this email suggests it is either renewal or a right of first refusal. Certainly not both as Hallucination argues.

---

[20] Also in Exhibit 7, after the "Term" talking point of "3 years – on Friday and Saturday," Petrucelli added "[BRYAN TO PROVIDE LANGUAGE TO ADDESS OPTIONS TO EXTEND OR ROFR]."  (Doc. 120-4, p. 36).

The following week, on June 12, 2013, Petrucelli further muddies the continued negotiations and states:

> Term:
> This is a 3 year term. I understand Hallucination continues to want to be protected beyond that. It seems the most prudent way to do this would be for certain first right of refusal regarding club nights etc at the end of the term (practically speaking if this venture is successful then it would make sense to continue accordingly)

(Doc. 120-5, p. 25).

At best, this exchange illustrates that Hallucination and Petrucelli were not even on the same page as to the scope of the alleged right of first refusal, much less did they come to an agreement on one.  Hallucination refers to the right of first refusal to enter into a purchase agreement or a long-term lease with Ritz for the building, whereas Petrucelli last refers to a right of first refusal to hold events on club nights.   Bottom line, there is nothing the Court can patch together to discern any sort of writing, individually or collectively, containing the essential terms or even the scope of an agreed right of first refusal.[21]   Therefore, Ritz and NCJ are entitled to summary judgment on Count II.

## V.  Conclusion

Ritz and NCJ have established their affirmative defense that the agreements alleged in Counts I and II of the Complaint are not enforceable under the statute of frauds.

Accordingly, it is **ORDERED**:

---

[21] Even if the emails relied on by Hallucination created an enforceable right of first refusal (and the Court finds that they did not), there is no evidence that it was triggered.  According to the plain language of the alleged right of first refusal, it would only be triggered if Ritz sought to enter into a long-term lease or if Ritz sought to sell the Ritz building.  There is nothing to suggest that Ritz did either.  Ritz did not own the building, and the only lease before the Court is an unexecuted agreement between Ritz and John Santoro for the use of Ritz's event space during the month of May 2016.  (Doc. 120-13).

(1)     Ritz and NCJ's Amended Renewed Motion for Summary Judgment on Counts I and II of Plaintiff's Complaint (Doc. 115) is **GRANTED**.

(2)     The Court will separately enter judgment in favor of Defendants on all of Hallucination's claims in this adversary proceeding.

(3)     The continued pretrial conference that was set for February 28, 2022, as well as the four-day trial that was set for March 1, 2022, are cancelled.


Service of this Order other than by CM/ECF is not required.  Local Rule 9013-3(b).